JASON M. BUSSEY (Cal. Bar No. 227185)
ERIN E. WILK (Cal. Bar No. 310214)
RUSSELL R. O'BRIEN (Fla. Bar No. 084542)
obrienru@sec.gov
KATHLEEN M. HITCHINS (Pa. Bar No. 307537, D.C. Bar No. 996636)
hitchinsk@sec.gov
MADIHA M. ZUBERI (Cal. Bar No. 326962)
zuberim@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 700
San Francisco, CA 94104
(415) 705-2500 (Telephone)
(415) 705-2501 (Facsimile)

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>BG WEALTH SHARING LTD and DSJ EXCHANGE PTY LTD,<br><br>Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Securities and Exchange Commission (the "SEC") alleges:

**SUMMARY OF THE ACTION**

1. This case concerns a fraudulent investment confidence scheme that raised more than $130 million from tens of thousands of retail investors across the United States and abroad, including dozens of investors in the Northern District of California. From at least October 2025 through June 2026, Defendants BG Wealth Sharing Ltd ("BG Wealth") and DSJ Exchange PTY Ltd ("DSJ Exchange," together with BG Wealth, the "Defendants") convinced investors to participate in a purported "wealth-sharing program" that promised extraordinary, risk-free

returns using so-called "signals" generated by Super Intelligence (or "AI" as referred to by Defendants, hereinafter "SI") for crypto asset trading.[1]

2. BG Wealth represented to investors that it was the world's largest hedge fund and an SEC-licensed investment adviser. It promised returns of at least 60% each month, told investors they could double their principal in 40 days, and assured them that their investments carried "zero risk." According to BG Wealth, investors could expect these results because its founder, described as "Professor" Stephen Beard, had developed proprietary SI-based trading signals with 99.6% accuracy. DSJ Exchange held itself out as a licensed, secure crypto asset trading platform that executed trades and displayed resulting profits.

3. Defendants gained the trust of investors, in part, by misusing the SEC's public filing systems. Specifically, BG Wealth filed with the SEC a Form ADV claiming to be an exempt reporting adviser, and DSJ Exchange filed with the SEC a Notice of Exempt Offering of Securities on Form D, announcing a purported $100 million exempt securities offering. Defendants then portrayed those filings—and fabricated registration certificates bearing the SEC's seal—as proof that the SEC had licensed or approved them, even though the SEC had granted no such license or approval.

4. Once lured into the scheme, BG Wealth directed investors to open accounts on DSJ Exchange's online platform (accessible via a website domain or through a mobile app), deposit crypto assets, and copy alphanumeric "trading signals" distributed by BG Wealth into their accounts. BG Wealth claimed DSJ Exchange automatically traded only 1% of the capital in an investor's account, which was then purportedly pooled with other investors' funds and traded on the "open crypto market." The online platform for DSJ Exchange displayed investors' supposed trades, profits, and growing balances.

---

[1] On September 29, 2026, the President issued Executive Order 14434, *Inaugurating the Era of Super Intelligence*, directing executive departments and agencies to use the term Super Intelligence (SI) in place of Artificial Intelligence. According to the Executive Order, Super Intelligence means the technologies and systems encompassed by the term "artificial intelligence" as defined in Section 9401(3) of title 15, United States Code.

5. The entire program was a fiction. Neither Defendant was registered with the SEC, and the Forms ADV and D they filed contained false information. Defendants did not use investor assets for the represented trading, and the profits displayed to investors on DSJ Exchange's online platform were illusory. Instead, Defendants misappropriated the vast majority of investor assets and, to prolong the scheme, returned the remainder (no more than $25 million) to wallet addresses likely associated with investors in Ponzi-like payments.

6. Defendants' scheme was extraordinarily successful. From March 2026 through early June 2026 alone, Defendants received over $130 million from more than 223,000 blockchain addresses.

7. Defendants' scheme succeeded in part due to the sophisticated multi-level marketing structure they employed, which included recruiting U.S.-based promoters and using social media, encrypted messaging channels, weekly live videoconferences, and roadshow events in major U.S. cities. Investors received additional trading signals and became eligible for bonuses, rewards, commissions, and "transaction volume dividends" by recruiting new investors and building teams.

8. Although Defendants gave investors false confidence in the scheme by allowing them to withdraw their funds, Defendants discouraged investors from doing that through fees as high as 20% and multi-day delays. After authorities seized one of BG Wealth's principal websites in April 2026, BG Wealth falsely blamed a "Chinese hack" to defuse investor concerns. DSJ Exchange eventually blocked withdrawals altogether. Defendants then demanded additional "tax" payments from investors seeking their money and directed investors to deposit still more assets to migrate to a new platform called HQI Exchange or "HQIEX." Investors who paid remained unable to withdraw their funds.

9. While Defendants are U.S. corporate entities, upon information and belief, the scheme was operated by individuals located abroad. As a result of Defendants' fraudulent scheme, investors suffered losses exceeding $100 million.

10. Through their conduct, Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange

Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. BG Wealth also violated Sections 204(a) and 207 of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-4(a), 80b-7].

11. The SEC seeks permanent injunctive relief, disgorgement of ill-gotten gains with prejudgment interest on a joint and several basis, civil monetary penalties, an order prohibiting BG Wealth and those acting with it from filing Forms ADV as an exempt reporting adviser, and other appropriate relief.

**JURISDICTION AND VENUE**

12. The SEC brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), 77v(a)]; Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78aa]; and Sections 209(d), 209(e), and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), 80b-14].

13. This Court has jurisdiction over this action under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

14. Defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce, the mails, and facilities of a national securities exchange in connection with the acts, transactions, practices, and courses of business alleged in this Complaint. For example, as further detailed below, Defendants solicited investors throughout the United States and furthered their scheme in part through websites that were accessible to investors in multiple states.

15. Venue is proper in this District under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14]. Among other things, Defendants solicited and accepted investments from at least 45 residents in this District, the individual who paid the fee to file the Form ADV on behalf of BG Wealth resides in this District, and at least one individual located in this District promoted Defendants' wealth-sharing program and organized events through which BG Wealth and DSJ Exchange solicited investors.

16. Under Civil Local Rule 3-2(d), this action should be assigned to the San Francisco Division or the Oakland Division because a substantial part of the events and omissions giving rise to the claims alleged here occurred in San Francisco and Alameda counties.

## DEFENDANTS

17. **BG Wealth Sharing Ltd** is a Colorado corporation formed in April 2025 that, while operational, was purportedly headquartered in Denver, Colorado, but whose purported principal place of business was a virtual mailbox. It was in good standing with the Colorado Secretary of State until at least June 30, 2026, but is presently listed as noncompliant. BG Wealth has never been registered with the SEC and has never had a class of securities registered with the SEC. On August 16, 2025, BG Wealth filed a Form ADV with the SEC claiming to be an exempt reporting adviser. It falsely advertised itself on its websites and in promotional materials and videos as licensed by the SEC.

18. **DSJ Exchange PTY Ltd** is a Colorado corporation formed in June 2025 that, while operational, was purportedly headquartered in Aurora, Colorado, but whose purported principal place of business was a temporary office-rental space. It was in good standing with the Colorado Secretary of State until at least September 1, 2026, but is presently listed as noncompliant. It has never been registered with the SEC and has never had a class of securities registered with the SEC. On July 11, 2025, DSJ Exchange filed a Form D with the SEC claiming revenue of over $100 million, claiming to be conducting a $100 million exempt securities offering of pooled investment fund interests, and claiming an exemption from registration pursuant to Rule 506(c) of Regulation D of the Securities Act. It falsely held itself out as licensed by the SEC.

## RELATED PERSON

19. **"Professor" Stephen Beard** ("Beard"), age and residency unknown, is BG Wealth's purported founder and chief executive officer. Beard communicated with investors through live video appearances and BonChat, an encrypted messaging platform based in Hong

Kong and used by BG Wealth. Beard has never been registered with the SEC in any capacity. Upon information and belief, Beard is an assumed identity.

## FACTUAL ALLEGATIONS

### A. Defendants Created and Promoted the Wealth-Sharing Program

20. From October 2025 through June 2026 (the "Relevant Period"), BG Wealth and DSJ Exchange each maintained websites at various domains (including bgwealthsharing.com, bg6988.com, and bg661.com for BG Wealth, and dsj080.com and dsj777.com for DSJ Exchange) on which they made representations relevant to the scheme described herein, including the following:

21. BG Wealth described itself on its websites as an SEC-licensed adviser and subsidiary of a global financial group established in 2018 by Beard on behalf of the International Monetary Fund.

22. BG Wealth marketed itself on its websites as the "world's largest hedge fund" with the goal of lifting "millions of people out of poverty" through a wealth-sharing program that purportedly allowed "passive investors" to earn stable returns on idle funds.

23. According to BG Wealth's websites, the program generated returns by trading crypto assets using signals developed by Beard and other BG Wealth finance professionals through a proprietary "AI data collection system." BG Wealth claimed that its signals were 99.6% accurate and that its financial professionals had a "100% success rate."

24. BG Wealth promised investors high, guaranteed returns without risk. Its websites stated that "[t]he monthly fund return rate is at least 60%, forming a zero-cost, zero-risk investment environment" and that investors could "double [their] principal within 40 days."

25. BG Wealth's websites also promised "guaranteed fund protection." It claimed on its websites to hold £30 million in initial capital to cover all investment losses and stated it would generate additional trading signals to recoup any losses that occurred.

26. Investors could participate only through DSJ Exchange's online platform or mobile app. BG Wealth claimed on its websites to have a 10-year partnership with DSJ

Exchange, which it described as an SEC-licensed firm and "one of the top 100 exchanges in the world."

27. BG Wealth's website portrayed DSJ Exchange as a sophisticated platform for spot, options, margin, futures, and perpetual-contract trading in crypto assets. DSJ Exchange's homepage advertised its "AI-Powered Trading" and "Institutional-grade security," and claimed it provided trading and investment services for more than 40 digital asset products.

28. DSJ Exchange created videos viewable on YouTube of its chief executive officer promoting its online platform and partnership with BG Wealth.

29. Figure 1 displays a representative screenshot of DSJ Exchange's Online Platform as it appeared to investors during the Relevant Period.

***Figure 1 – View of DSJ Exchange's Online Platform***




30. BG Wealth directed investors to create DSJ Exchange accounts and deposit crypto assets with DSJ Exchange, including USDC, USDT, and Ethereum (ETH).

31. BG Wealth represented on its websites that DSJ Exchange would pool 1% of the capital in each investor's funded account with other investors' capital and trade that pool on established crypto asset trading platforms and would then distribute the resulting profits. BG Wealth sometimes referred to the resulting profits as "shared member profits."

32. Through the BonChat messaging app, Beard distributed alphanumeric trading "signals" twice each day. Investors simply copied each signal into a designated tab on their DSJ Exchange accounts and selected "confirm." The platform then displayed a supposed transaction and profit in the investor's account. Investors who did not enter a signal did not receive the displayed profit.

33. On its websites, BG Wealth described the wealth-sharing program as a "tripartite win-win structure" in which investors, BG Wealth, and DSJ Exchange collectively benefitted. It told investors that pooling their assets and collectively trading on DSJ Exchange using the same accurate signals would increase market movement and trading profits to the benefit of BG Wealth investors.

34. BG Wealth would, according to its websites, in turn benefit from receiving returns based on the transaction volume on DSJ Exchange's platform and by taking 40% of any profit on every trade executed.

35. According to BG Wealth's website, DSJ Exchange benefited by gaining members and earning a profit on trading fees and commissions. It also claimed that "[u]ser funds flow[ing] in the exchange [were used] as operating funds as well as for acquisitions, new construction, expansion, angel round financing, real estate hotels, tourism development and other investments."

36. Investors' purported account balances, as displayed on DSJ Exchange's online platform, generally doubled after approximately 40 days. BG Wealth initially permitted some withdrawals, which increased investors' confidence in the program. Defendants also discouraged withdrawals, however, by imposing fees as high as 20% and multi-day withdrawal delays.

### B. BG Wealth Used Multi-Level Marketing and Social Media to Expand the Scheme

37. BG Wealth encouraged investors to become promoters of BG Wealth's wealth-sharing program and rewarded investors for bringing new participants into the program.

Investors who recruited others could receive additional daily trading signals, which purportedly increased their profits.

38. BG Wealth urged each investor to “Level Up” by recruiting at least five additional investors. Investors who promoted BG Wealth could progress through as many as 12 levels and qualify for monthly bonuses, dividends, rewards, and commissions. BG Wealth also encouraged these promoters to form teams and become team managers, who purportedly received monthly “transaction volume dividends.”

39. For example, a promoter residing in this District, who established a brick-and-mortar office in Concord, California, rose to Level 7 by having approximately 5,000 downstream investors.

40. Both BG Wealth and its promoters advertised the program on social media platforms such as YouTube, TikTok, Facebook, Instagram, and Telegram during the Relevant Period. BG Wealth strongly encouraged investors to join its BonChat channel and attend weekly live videoconferences on Zoom that featured Beard and high-level U.S.-based promoters. These live Zoom videoconferences occurred regularly from as early as December 2025 through June 2026. During those appearances, Beard promoted the safety and security of the investments and encouraged investors to recruit others.

41. U.S.-based promoters also organized roadshows on behalf of BG Wealth in various U.S. cities, including: Las Vegas, Nevada, on November 30, 2025; Lāʻie, Hawaii, on December 15, 2025; and Salt Lake City, Utah, on April 15, 2026. Beard appeared live by video at some of these events.

42. Promoters also hosted parties and “recognition events” to recruit new investors, including one in San Leandro, California, in late January 2026.

43. The recruitment system worked. From March through mid-June 2026 alone, Defendants received over $130 million in investor deposits from more than 223,000 blockchain addresses associated with investors in more than 40 U.S. states, multiple U.S. territories, and abroad.

**C. Defendants Fabricated Trading and Misappropriated Investor Assets**

44. Defendants did not use investor assets for the represented trading, and the wealth-sharing program generated no trading profits.

45. DSJ Exchange instead operated a sham trading platform. It displayed fabricated transactions, profits, and account balances that made investors believe BG Wealth's purported SI-generated trading signals resulted in extraordinary returns.

46. After investors transferred their crypto assets to DSJ Exchange, instead of using them for trading as represented, Defendants misappropriated these assets by transferring them across blockchains and through intermediaries, in some instances transiting to or through common wallet addresses.

47. Defendants used some incoming investor assets to make Ponzi-like payments to earlier investors. Specifically, as much as $25 million flowed back to wallet addresses likely associated with investors.

48. Those Ponzi-like payments helped Defendants build trust with investors, induce additional investments, and prolong the scheme. Defendants misappropriated the remaining investor assets rather than investing them as represented.

**D. Defendants Used Sham SEC Credentials to Legitimize the Scheme**

49. Defendants repeatedly and falsely claimed that they were licensed and regulated by the SEC.

50. DSJ Exchange's website displayed a prominent banner, stating: "Global Regulated: Secure Trading with Peace of Mind. Institutional-grade security safeguards every transaction." Beard described DSJ Exchange as "a strong compliant licensed trading platform." BG Wealth's website claimed DSJ Exchange held licenses in more than 30 countries and regions, including a U.S. "SEC license."

51. BG Wealth's website displayed purported SEC registration certificates for both Defendants. Beard prominently displayed these certificates during his weekly live video

appearances. Each certificate bore the SEC's seal. The purported SEC registration certificates BG Wealth and Beard displayed are shown below in Figure 2.

***Figure 2 – Defendants' False SEC Registration Certificates***




52. Each certificate also contained data linking it to either the Form ADV or Form D filings. The purported SEC registration certificate for BG Wealth included the Central Registration Depository ("CRD") number assigned when BG Wealth filed its Form ADV. The CRD number was listed on BG Wealth's Form ADV and could be used to search for the Form ADV filing on the SEC's Investment Adviser Public Disclosure ("IAPD") website.

53. The certificate for DSJ Exchange included the Central Index Key ("CIK") number assigned through the SEC's EDGAR (Electronic Data Gathering, Analysis, and Retrieval) filing system. This CIK number was listed on DSJ Exchange's Form D filing and could be used to search for the Form D on the SEC's EDGAR system.

54. BG Wealth and its promoters directed investors to view BG Wealth's Form ADV on the SEC's IAPD website, which is available to the public, as purported proof that BG Wealth was "registered" with the SEC.

55. BG Wealth and its promoters also directed investors to DSJ Exchange's Form D on the SEC's EDGAR website, which is also publicly accessible, as purported proof that DSJ Exchange was "registered" with the SEC.

56. Those representations regarding registration and licensing were false. A Form ADV filed by an exempt reporting adviser and a Form D notice are not SEC licenses or evidence

that the SEC has approved the filer or its investments. Neither Defendant was registered with the SEC.

57. Additionally, the supposed SEC "certificates" were not issued by the SEC and instead were false and fraudulent documents created by Defendants. The SEC does not issue registration certificates.

**E. Defendants' Filings with the SEC Contained False Information**

58. Defendants' filings with the SEC also contained false information. Form ADV is the primary disclosure document used by investment advisers to provide information to the SEC and the investing public regarding the adviser's identity, business operations, ownership, control persons, clients, assets under management, and other aspects of its advisory business.

59. Form ADV is filed electronically through the Investment Adviser Registration Depository and is made publicly available through the IAPD website.

60. Although BG Wealth filed as an exempt reporting adviser ("ERA"), it was nevertheless required to provide specified information on Form ADV and maintain books and records supporting those disclosures. By signing and filing the Form ADV, BG Wealth certified that the information and statements contained therein were true and correct and that its books and records would be preserved and made available for SEC examination as required by law. Beard was a signatory of BG Wealth's Form ADV.

61. BG Wealth's Form ADV contained numerous false and misleading statements. Among other things, BG Wealth falsely represented that an independent public accounting firm named Indicator Global audited the private funds it purportedly advised; that BG Wealth maintained its principal office and place of business at a Colorado address during ordinary business hours; and that Beard was a registered investment adviser with an assigned individual CRD number.

62. The purported auditor identified in BG Wealth's Form ADV, Indicator Global, does not appear in any public registry of federal or state accounting firms. Instead, Indicator Global appears to have held itself out as an investment advisory business, filed its own Form ADV as an exempt reporting adviser, and publicly represented itself as providing investment-

related services. BG Wealth's representation that its private funds were audited by an independent public accounting firm was therefore false or lacked any reasonable basis.

63. BG Wealth's Form ADV listed as its principal office a PostNet virtual mailbox rather than an actual operating business office. The PostNet address functioned as a commercial mail-receiving and forwarding service, not as a physical location from which BG Wealth conducted its purported advisory business.

64. The U.S. telephone number listed in the Form ADV was disconnected. Mail sent to the addresses and persons identified in BG Wealth's Form ADV and state incorporation records was returned as undeliverable. As a result, regulators and members of the public could not communicate with BG Wealth using the contact information it provided in its SEC filing.

65. BG Wealth further failed to comply with its obligations under the Advisers Act to maintain and make available records supporting the information contained in its Form ADV. The SEC staff sought records and information to substantiate BG Wealth's representations, including records relating to its advisory business, operations, private funds, and other matters disclosed in its filing. BG Wealth failed to respond and did not produce records to substantiate those representations or make its books and records available for examination as required by law.

66. DSJ Exchange likewise submitted false information in documents filed with the SEC. DSJ Exchange submitted false information in its Form ID, the SEC's Uniform Application for Access Codes to File on EDGAR, which is used to obtain filing credentials and requires the disclosure of identifying information concerning the applicant. And the notary whose stamp appears on the Form ID did not notarize it.

67. DSJ Exchange also supplied a false business address and false email addresses and telephone numbers in its Form ID and Form D. The listed Colorado address is a temporary office-rental space. Its telephone numbers were disconnected or incorrect; messages left at a generic voicemail associated with a phone number listed on DSJ Exchange's SEC filings were not returned; a Canadian number for DSJ Exchange on its SEC filings was disconnected, and

mailed SEC subpoenas sent to DSJ Exchange or its purported registered agent were returned to sender or otherwise went unanswered.

68. Through these false SEC filings, together with the fabricated SEC certificates, Defendants created a false appearance of legitimacy and government approval and used that appearance to induce investors to entrust Defendants with their assets.

**F. Defendants Continued the Scheme After Regulatory Warnings**

69. Beginning in May 2025 and prior to the scheme gaining traction in the United States, at least seven foreign securities regulators issued public warnings that BG Wealth and DSJ Exchange were fraudulent or operating without required licenses.

70. Beginning in March 2026, state authorities in Alaska, Hawaii, Oklahoma, Texas, Utah, Washington, and Wisconsin issued warnings and cease-and-desist orders against BG Wealth, DSJ Exchange, and certain senior promoters.

71. Defendants nevertheless continued to operate and promote the wealth-sharing program into June 2026. They repeatedly changed website domains after authorities identified their sites and denied that the program was unlawful. BG Wealth's website then added a "FAQ" explaining why the wealth-sharing program was not a Ponzi scheme.

72. On April 23, 2026, the U.S. Federal Bureau of Investigation seized BG Wealth's original website domain as part of a joint law enforcement operation. After the website seizure, Beard told investors that a Chinese hacker was responsible and urged them to remain calm. DSJ Exchange's website continued to operate until Defendants blocked withdrawals completely.

73. Defendants then attempted to move investors from DSJ Exchange to a new platform called HQI Exchange or "HQIEX." Beard claimed that DSJ Exchange had been hacked, was no longer safe, and was experiencing regulatory problems.

74. When investors sought to withdraw their funds, Beard and DSJ Exchange's purported chief executive officer told them to pay a "tax" to "unlock" their accounts. Investors who paid still could not withdraw their assets.

75. Defendants also told investors to deposit additional funds to "move" to HQIEX and regain access to their prior investments. This demand sought to extract still more assets from investors already unable to recover their money.

76. On September 29, 2026, in an apparent attempt to perpetuate the fraud, DSJ Exchange changed its name on EDGAR to Horizon Crest Capital Inc. ("Horizon Crest"), which purports to be a New York corporation, and filed a Form D for a purported offering by Horizon Crest.

### G. The Wealth-Sharing Program Was Offered and Sold as an Investment Contract

77. Defendants offered and sold the wealth-sharing program as an investment contract and therefore a security.

78. Investors committed money in the form of crypto assets, including USDC, USDT, and ETH, by depositing those assets on DSJ Exchange's platform to invest in the program.

79. Defendants represented that DSJ Exchange would pool a portion of each investor's assets with assets from other investors, use the pooled assets for trading, and distribute shared profits according to each investor's contribution.

80. Defendants also tied their own financial fortunes to the program. BG Wealth claimed it would keep 40% of every purported trading profit and use its own funds to pay for any trading losses. DSJ Exchange purportedly earned trading fees and commissions, and used investor deposits for its own investments, all of which would increase based upon the Defendants' efforts to expand the number of investors in the program. Promoters' profits, including transaction volume dividends, depended on the activity of the investors whom they or their teams recruited.

81. Investors reasonably expected profits from Defendants' essential managerial efforts. BG Wealth purportedly selected DSJ Exchange as a partner, developed the SI trading system, created and distributed trading "signals" based upon its and Beard's expertise, operated the program, promoted it, supported recruiters, and guaranteed investor funds. DSJ Exchange

operated the purported trading platform and infrastructure through which investors were to receive returns.

82. BG Wealth did not give investors any meaningful control over the enterprise. Rather, BG Wealth's websites described participants as passive investors. Promoters who recruited others likewise depended on Defendants to operate the platform, produce the promised returns, and pay bonuses and commissions.

**FIRST CLAIM FOR RELIEF**

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

*(All Defendants)*

83. The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 82.

84. Defendants, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly:

a. Employed devices, schemes, or artifices to defraud;

b. Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

c. Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers of securities.

85. By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**

*Violations of Section 17(a) of the Securities Act*

*(All Defendants)*

86. The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 82.

87. Defendants, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

a. knowingly or recklessly employed devices, schemes, or artifices to defraud;

b. knowingly, recklessly, or negligently obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c. knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

88. By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF

*Violations of Section 204(a) of the Advisers Act*

*(BG Wealth)*

89. The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 82.

90. BG Wealth acted as an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)]. BG Wealth holds itself out as an investment adviser or as one who provides investment advice by filing a Form ADV and reporting that it is an ERA.

91. As set forth in paragraphs 58 through 68, BG Wealth failed to make its books and records available for examination by SEC staff.

92. By reason of the foregoing, BG Wealth has violated, and unless enjoined will continue to violate, Section 204(a) of the Advisers Act [15 U.S.C. § 80b-4(a)].

**FOURTH CLAIM FOR RELIEF**

*Violations of Section 207 of the Advisers Act*

*(BG Wealth)*

93. The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 82.

94. As set forth in paragraphs 58 through 68, BG Wealth, by use of the mails and the means and instruments of interstate commerce, directly and indirectly, willfully made untrue statements of material fact in a report filed with the SEC under the Advisers Act.

95. By reason of the foregoing, BG Wealth has violated, and unless enjoined will continue to violate, Section 207 of the Advisers Act [15 U.S.C. § 80b-7].

**PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

**I.**

Permanently enjoin Defendants from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**II.**

Permanently enjoin BG Wealth from directly or indirectly violating Sections 204(a) and 207 of the Advisers Act [15 U.S.C. §§ 80b-4(a) and 80b-7].

**III.**

Permanently restrain and enjoin BG Wealth and its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, from filing Forms ADV as an exempt reporting adviser.

**IV.**

Order Defendants, jointly and severally, to disgorge all ill-gotten gains derived from the activities alleged in this Complaint, together with prejudgment interest, pursuant to Section 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), 78u(d)(7)].

**V.**

Order Defendants to pay civil monetary penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and, as to BG Wealth, under Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

**VI.**

Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered and to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VII.**

Grant such other and further relief as this Court may determine to be just, equitable, and necessary.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38 and L.R. 3-6, the SEC demands a trial by jury on all issues so triable.

Dated: October 29, 2026

Respectfully submitted,

/s/*Russell R. O'Brien*
Russell R. O'Brien
*Attorney for Plaintiff*
SECURITIES AND EXCHANGE COMMISSION